**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| VOIP-PAL.COM, INC. | |
| Plaintiff, | CIVIL ACTION NO. 1:21-cv-1085 |
| v. | JURY TRIAL DEMANDED |
| HUAWEI TECHNOLOGIES CO., LTD., and HUAWEI TECHNOLOGIES USA, INC., | |
| Defendants. | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff VoIP-Pal.com, Inc. ("VoIP-Pal"), for its Complaint against Defendants Huawei Technologies Co., Ltd. and Huawei Technologies USA, Inc. (collectively, "the Huawei Defendants" or "Defendants"), alleges as follows:

**THE PARTIES**

1.      Plaintiff VoIP-Pal is a Nevada corporation with its principal place of business located at 7215 Bosque Boulevard, Waco, Texas 76710.  VoIP-Pal is registered to do business in the State of Texas.

2.      On information and belief, Defendant Huawei Technologies Co., Ltd. ("Huawei PRC") is a corporation organized under the laws of the People's Republic of China, having a principal place of business listed at Bantian, Longgang District, Shenzhen 518129, People's Republic of China.  On information and belief, Huawei PRC is wholly-owned subsidiary of Huawei Investment & Holding Co., Ltd., which is based in the People's Republic of China.  The

People's Republic of China is a signatory to the Hague Service Convention, and Huawei PRC may

be served through the Central Authority in that country.  Huawei PRC has links to the People's

Liberation Army of China, and since 2018, because of national security concerns, numerous

restrictions have been placed on Huawei products for sale in the United States.  The Central

Authority in the PRC is not expected to cooperate in effecting service on Huawei PRC.

3.      On information and belief, Defendant Huawei Technologies USA, Inc. ("Huawei

USA") is a corporation organized under the laws of the State of Texas, with a principal place of

business at 5700 Tennyson Parkway, Suite 600, Plano, Texas  75024.  On information and belief,

Huawei USA is a wholly-owned subsidiary of Huawei Investment & Holding Co., Ltd., which is

based in the People's Republic of China.   Defendant Huawei USA may be served with process

through its registered agent, the Corporation Service Company, at 1999 Bryan Street, Suite 900,

Dallas, Texas  75201-3136.

4.      Huawei PRC makes, has made, uses, offers for sale, sell and imports to the United

States a wide variety of products and services, including consumer electronics, mobile phones,

tablets, laptops and other personal computers, storage devices, televisions and other electronics

devices.

5.      On information and belief, Huawei USA is responsible for sales and distribution in

the United States of Huawei's consumer electronics products, including the accused products in

this case.

6.      On information and belief, Huawei cellular telephones, tablets and other electronic

devices are imported by Huawei PRC into the United States and distributed by Huawei USA.  On

information and belief, Huawei electronic devices, including cellular telephones, are sold on eBay

and Amazon.com.  On information and belief, the Huawei Defendants make, have made, use, offer

to sell and sell the Nexus 6P cellular telephone for Google, which was sold throughout the United States, including by eBay and Amazon.com.  Huawei electronic devices were sold to storefronts and authorized retailers for wireless carriers operating in this District, including Verizon, AT&T and T-Mobile, who in-turn resold Huawei's electronic devices to paying wireless subscribers intended for use on their respective networks.  Unlocked Huawei cellular telephones currently sold by Amazon, eBay, Walmart and others are manufactured intended for use on wireless carrier networks in the United States.

7.     On information and belief, the Huawei Defendants regularly conduct and transact business in the State of Texas, throughout the United States, and within this District, and as set forth below, have committed and continue to commit, tortious acts of infringement within and outside the State of Texas and within this District.

## JURISDICTION AND VENUE

8.     This action is a civil action for patent infringement arising under the patent laws of the United States, Title 35, United States Code ("U.S.C.") § 1 et seq., including 35 U.S.C. §§ 271 and 281-285.  This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338.

9.     This Court has personal jurisdiction over the Defendants by virtue of their systematic and continuous contacts with this jurisdiction, as alleged herein, as well as because the injury to VoIP-Pal occurred in the State of Texas and the claim for relief possessed by VoIP-Pal against the Defendants for injuries arising in the State of Texas.  On information and belief, Defendants have purposely availed themselves of the privileges of conducting business within the State of Texas, such business including but not limited to: (i) at least a portion of the infringements

alleged herein; (ii) purposefully and voluntarily placing one or more infringing products or services into the stream of commerce with the expectation that they will be purchased by consumers in this forum; or (iii) regularly transacting or soliciting business, engaging in other persistent courses of conduct, or deriving or attempting to derive substantial revenue and financial benefits from goods and services provided to individuals residing in the State of Texas and in this District.  Thus, Defendants are subject to this Court's specific and general personal jurisdiction under due process and the Texas Long Arm Statute.

10.     Personal jurisdiction also exists specifically over Defendants because Defendants, directly or through subsidiaries or intermediaries (including customers, distributors, retailers, and others), subsidiaries, alter egos, and/or agents – ships, distributes, offers for sale, sells, imports, advertises, or markets in the State of Texas and in this District, one or more products and services that infringe the Patents-in-Suit, as described particularly below.  The Huawei Defendants have purposefully and voluntarily placed one or more of their infringing products and services, as described below, into the stream of commerce with the awareness and/or intent that these products or services will be purchased or used by consumers in this District.  The Huawei Defendants have knowingly and purposefully shipped infringing products and provided services into and within this District through an established distribution channel.  These infringing products and services have been and continue to be purchased and used by consumers in this District.

11.     VoIP-Pal's claim for relief for patent infringement arises directly from the activities of Defendants in this District.

12.     On information and belief, the Huawei Defendants, directly and/or through their customers have transacted business in this District and has committed acts of patent infringement in this District.  Defendant Huawei PRC is a foreign corporation organized under the laws of the

People's Republic of China and jurisdiction and venue is proper in any federal district court, including this District, pursuant to 28 U.S.C. § 1391(c)(3).   Defendant Huawei USA is a Texas corporation and resides in this District for purposes of 28 U.S.C. § 1400(b)(1), as interpreted by the Supreme Court in *TC Heartland LLC v. Kraft Foods Brands LLC.*.  Thus, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND OF THE TECHNOLOGY AND THE PATENTS-IN-SUIT

13.     United States Patent No. 8,630,234 (the "'234 patent") entitled "Mobile Gateway" was duly and legally issued by the United States Patent and Trademark Office on January 14, 2014, after full and fair examination.  A copy of the '234 patent is attached hereto as Exhibit 1.

14.     United States Patent No. 10,880,721 (the "'721 patent") entitled "Mobile Gateway" was duly and legally issued by the United States Patent and Trademark Office on December 29, 2020, after full and fair examination.  A copy of the '721 patent is attached hereto as Exhibit 2.

15.     The '234 and '721 patents are referred to in this Complaint as the "Patents-in-Suit".

16.     VoIP-Pal is the sole owner and assignee of the entire right title and interest in the Patents-in-Suit and has the right to sue and recover damages for any current or past infringement of the Patents-in-Suit.

17.     The inventions of the Patents-in-Suit originated from breakthrough work and development in the internet protocol communications field.

18.     VoIP-Pal has provided significant improvements to communications technology by the invention of novel methods, processes and apparatuses that facilitate communications across and between internet protocol-based communication systems and other networks, such as internally controlled systems and external networks (e.g., across private networks and between

private networks and public networks), including providing access to and routing through internet protocol based communication systems.

19.     The earliest telephone systems to receive public use within the United States involved a telephone directly connected to a human operator. A portion of the phone rested on a mechanical hook such that the operator was signaled when the portion was lifted from the hook. A caller would then say the name of the person they wished to call to the operator. If the callee was connected to the same telephone switch board the operator would physically pull out a cable associated with the caller's phone and plug the cable into a socket associated with the callee's telephone. If the callee was associated with a different switchboard, and thus out of reach of the operator, a second operator would be involved to bridge the gap to the appropriate switchboard. While initially very effective compared to no telephone service, this structure quickly proved error prone (operators would connect the wrong party) and limiting to the number of possible telephones because of the physical limits of switchboards and cable to be pulled. This basic system corresponds to the introduction of a Plain Old Telephone Service ("POTS") connection to the operator. In these configurations, there was a dedicated, point-to-point electrical connection between the caller and the callee.

20.     Rotary dialing eventually was introduced, beginning at around the turn of the 20th century, where a rotary disk was marked with numbers from zero to nine. A caller would spin the wheel and a mechanical device in the telephone would cause a sequence of electrical pulses to be sent to the network corresponding to the digit dialed, for example, four pulses would be sent for the number four. Rather than speaking to a human operator, an electric device would count the pulses and begin to route a call once an appropriate and valid sequence of digits was dialed by the caller. This advancement improved reliability of call routing and reduced the time required to

initiate a call. But, even so, there was a dedicated, point-to-point electrical connection between the caller and the callee. As multiple companies entered the market of telephone service and the number of customers increased, an issue emerged where a caller would be a customer of one telephone company and the callee would be a customer of another. The solution that emerged to this problem was to introduce trunk lines connecting one company to another.

21.     Eventually, as the number of companies continued to increase and telephone services spread over much larger geographic areas, the notion of a Public Switched Telephone Network ("PSTN") emerged. The term derives from the notion, at least in part, that the dedicated wires used to connect the caller and callee were "circuit-switched" to connect the two parties. The PSTN developed gradually into the middle of the 20th century, still built around the notion of rotary dialing and POTS connections to the individual telephones. These calls involved analog communications over circuit-switched electrical connections. A circuit-switched network involves assigning dedicated resources, such as switch settings and specific wires, to establish a link from the caller to the callee. While the call is ongoing, these resources cannot be used for any other communications.

22.     The next important advancement for consumer telephone service, introduced broadly during the second half of the 20th century, was the introduction of push-button telephones. With such telephones the rotary dial was replaced by a matrix of buttons, each labeled with a digit from zero through nine along with the additions of '*' and '#'. The underlying signaling technology was called dual-tone multiple-frequency ("DTMF") and involves two different audible tones being sent simultaneously from the telephone into the telephone network. A receiver within the network decoded these tones and formed them into a sequence of digits indicating the number of the callee.

23.     Around this same time a scheme for international telephone addressing was introduced, with a numeric protocol for identifying one country from another and providing country-specific routing within the destination country. The E.164 standard now documents how a caller anywhere in the world, for example, in Ann Arbor, Michigan, can identify a telephone number at any other location, such as Avignon, France. While many of these advances, such as DTMF dialing and automated international routing, may have been originally introduced via *ad hoc* methods, eventually they required multiple parties (companies and governments) to agree on protocols to enable wide-spread reliable use and inter-operability among different telephone communications networks. Even with all these advances, the systems still relied on circuit-switched technology that dedicated resources between the caller and the callee for the duration of a call. The move to take human operators out of the loop, with the introduction of rotary dialing, combined with the fast increase in demand for telephone services throughout the 20th century, resulted in the development of automated telephone switches. These devices comprised a set of input ports, each dedicated to, and associated with a specific caller, and output ports, each capable of being associated with a callee. A small local telephone system may have had a single switch while a larger service would use a large number of switches that were connected to each other. A switch from a local service provider would be connected to a trunk line which then connected to an input switch of another service provider. These switches originally supported analog voice calls initiated via rotary dialing and dedicating input and output ports as well as physical wires for each circuit-switched call.

24.     Eventually analog voice services were replaced within the network with digital voice. Digital voice is communicated using a sequence of chunks (or packets) of data. This advancement allowed physical resources to be shared among multiple calls over short bursts of

time. For example, a physical wire can move a packet for one call at a specific instance in time and then move a packet for a totally different call subsequently, only to later return to transfer a new packet for the original call. This advance is called packet-switched communications and provided an important increase in network reliability and efficiency while driving down the cost. However, in most situations throughout the 20th century (and often still today), the connection to the end user's physical telephone is analog. While network switches operate via digital circuitry, and often comprise programmable processors executing software, they tend to be dedicated special-purpose devices. The conversion between analog and digital encoding is typically done at the point where the PSTN network switch connects to the POTS handset, for example, at a device called a Class-5 telephone switch, which connects the customer POTS handset to the PSTN network of a service provider's central office.

25. The Internet became important to consumers, via broad deployment, during the late 1980's and early 1990's. Eventually available bandwidth and reliability increased to the point where pioneers began to experiment with techniques to carry voice communications over the Internet. These early efforts began to focus on techniques called Voice Over Internet Protocol (VOIP) and session initiation protocol (SIP). VOIP provided a consistent set of protocols and mechanisms for moving digital voice packets between two callers using the Internet rather than existing PSTN networks. SIP provided a mechanism for establishing and terminating communication sessions such as calls between users of a VOIP service. For example, a callee could register with a VOIP service so that an identifier (such as their name, email address or a nickname) could be associated with the computer to which they are logged in. Eventually VOIP services increased to provide interoperability with the existing PSTN services. For example, the company Skype began to allow a user to call a PSTN number using a feature marketed as "Skype

out". However, the user was required to explicitly classify the call as a PSTN call by specifying a real physical telephone number. In this case the VOIP system had to include a gateway to bridge from the VOIP network to the PSTN network in order to route to the physical telephone. Calls that used a proprietary non-PSTN user identifier such as an email or nickname remained within the VOIP network and were not routed to the PSTN network to a POTS telephone.

26.     The advent of digital cellular networks in the 1990's allowed customers to physically move their mobile phones from one location to another and enabled convenient mobile calling. However, despite the increasing popularity of the Internet and the development of Internet-based VOIP services such as Skype, mobile phone users were forced to use conventional calling processes to place calls over the then-existing mobile phone and PSTN communication infrastructure. Also, mobile phone users often had to pay roaming charges for calls if they were not located in their home area or incurred significant costs to place long-distance calls if the called party was not local.  One technique developed for avoiding the long-distance charges charged by mobile telephone service providers was to use a calling card to place a call to a local telephone number or to a less-expensive phone number (such as a toll-free number), but this technique was cumbersome and complex as it required the user to dial a special set of numbers or codes. However, the Patents-in-Suit disclose and claim a distinct manner of mobile call routing.

27.     Digifonica, a wholly owned subsidiary of patent owner VoIP-Pal, starting in 2004 eventually came to employ over a dozen top professionals (e.g., software developers, system administrators, QA/test analysts) including three Ph.D.'s with engineering backgrounds, to develop innovative software solutions for communications. Digifonica spent over $15,000,000 researching, developing, and testing a communication solution capable of seamlessly integrating a private voice-over-IP ("VoIP") communication network with an external network (i.e., the

"public switched telephone network" or "PSTN"), by bridging the disparate protocols, destination identifiers and addressing schemes used in the two networks.  Furthermore, Digifonica's system optimized the choice of communication infrastructure to be used for any given call based on the location of the caller and/or callee.  Digifonica's system chose the optimal infrastructure to route both calls placed over cellular and PSTN networks or placed via internet protocol networks.  By the mid-2000's, Digifonica had successfully tested intra- and inter-network communications (i.e., communications within the private Digifonica system and between the Digifonica system and the PSTN) by implementing high-capacity communication nodes across three geographic regions, including actual working communication nodes in Vancouver (Canada) and London (UK). Digifonica's R&D efforts led to a number of patent grants, including the Patents-in-Suit.

28.     The Patents-in-Suit describe novel systems, apparatuses and methods for providing an access code to roaming mobile communication devices such as smartphones, to enable access to suitable communication routing infrastructure, wherein the selection of the communication channel for a call can be optimized based on the calling device's current location.

## OVERVIEW OF THE ACCUSED INSTRUMENTALITIES

29.     Each of the instrumentalities described in this Complaint made, used, sold, offered for sale, and/or imported by Defendants comprise systems, devices and computer-executable program code relating to and supporting communications using devices, computers, servers, systems and methods used by, operated by and performed by Defendants.

30.     Defendants provide, manufacture, support, and operate a messaging and communication product platform (the "Huawei Calling System") that includes desktop computers, laptops, tablets, smartphones, and other mobile devices, as well as enterprise to small office-home

office level telephony hardware and software. Defendants actively encourage and enable users of Huawei devices to participate in mobile telephone roaming and using the Huawei Calling System.

31.     In the Huawei Calling System, users of Huawei desktop computers, laptops, tablets, smartphones, and mobile devices are encouraged and enabled to send messages including text, images, video and audio to others using Huawei hardware, firmware, configuration data, and/or Voice over WiFi (VoWiFi) software applications developed and/or used by Huawei for supported Huawei devices to communicate with one or more third-parties' VoWiFi server infrastructures, such as all major wireless telephone companies in the United States that provide VoWiFi calling.

32.     The Huawei Calling System enables mobile telephone and mobile device roaming. The Huawei Calling System produces an access code comprising one or more portions of information.   For example, the Huawei Calling System produces information identifying an Internet Protocol (IP) network address of at least one calling server that enables a call to be made to a callee. In the Huawei Calling System, the access code is based on a location identifier and/or based on a location pre-associated with a mobile telephone or device associated with a caller.   The Huawei Calling System, for example, uses a combination of information identifying the IP network address of the calling server and call session information obtained via the calling server to initiate a call using the access code to identify the call.   The Huawei Calling System is not shown as having any other purposes, and, given its particular focus on messaging and voice-over-IP services, is not a staple article or commodity suitable for non-infringing uses.

33.     Defendants also provide, manufacture, support, and operate the Huawei Cloud Meeting Calling System, which includes desktop computers, laptops, tablets, smartphones, and other mobile devices as well as enterprise to small office-home office level telephony hardware, software, and cloud-based services provided, manufactured, configured and/or supported by

Defendants. Defendants actively encourage and enable users of desktop computers, laptops, tablets, smartphones, and other mobile devices to participate in mobile telephone roaming.

34. The Huawei Cloud Meeting Calling System includes Huawei Cloud Meeting, or simply Cloud Meeting, which is a cross-platform centralized messaging and communication (e.g., voice-over-IP) service owned by Huawei. The Huawei Cloud Meeting Calling System allows smartphone and desktop users to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other content. See https://www.huaweicloud.com/intl/en-us/product/meeting.html.

35. In the Huawei Cloud Meeting Calling System, users of the desktop computers, laptops, tablets, smartphones, and mobile devices can send messages including text, images, video and audio to others using Cloud Meeting client software applications developed by Huawei for supported devices to communicate with a Huawei server infrastructure owned and/or operated by Huawei. The Cloud Meeting client software applications running on most supported devices includes Huawei Calling, which is a voice and video calling feature incorporating techniques described in the Patents-in-Suit. Additionally, in the Huawei Cloud Meeting Calling System, the Huawei server infrastructure includes one or more communication networks, one or more servers, one or more services, and/or one or more other resources associated with the Huawei server infrastructure and using Cloud Meeting server software applications developed by Huawei to implement setup, routing, and delivery of non-real time (e.g., messages) and real time (e.g., voice and video calls) communication to and from the supported devices using the Cloud Meeting client software applications. The Cloud Meeting server software applications running on servers owned and/or operated by Huawei include the Huawei Calling feature incorporating techniques described in the Patents-in-Suit. The Huawei Cloud Meeting Calling System is not shown as having any

other purpose, and, given its particular focus on messaging and voice-over-IP services, is not a staple article or commodity suitable for non-infringing uses.

36.    Defendants also provide, manufacture, support, and operate the Huawei CloudLink Calling System that includes desktop computers, laptops, tablets, smartphones, and other mobile devices as well as enterprise to small office-home office level telephony hardware, software, and cloud-based services provided, manufactured, configured and/or supported by Huawei and used by Huawei enterprise customers. Defendants actively encourage and enable users of desktop computers, laptops, tablets, smartphones, and other mobile devices and the Huawei enterprise customers to participate in using the CloudLink Calling System.

37.    The Huawei CloudLink Calling System includes Huawei CloudLink Video Conferencing Platform, or simply CloudLink, which is a cross-platform centralized messaging and communication (e.g., voice-over-IP) service owned by Huawei. The Huawei CloudLink Calling System allows smartphone and desktop users to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other content. See, e.g., https://e.huawei.com/en/solutions/enterprise-collaboration/videoconferencing-platform.

38.    In the Huawei CloudLink Calling System, users of the desktop computers, laptops, tablets, smartphones, and mobile devices can send messages including text, images, video and audio to others using CloudLink client software applications developed by Huawei for supported devices to communicate with a Huawei CloudLink-enabled server infrastructure owned and operated by a Huawei enterprise customer. The CloudLink client software applications running on most supported devices includes Huawei Calling, which is a voice and video calling feature incorporating techniques described in the Patents-in-Suit. Additionally, in the Huawei CloudLink Calling System, the Huawei CloudLink-enabled server infrastructure includes one or more

communication networks, one or more servers, one or more services, and/or one or more other resources associated with the Huawei CloudLink-enabled server infrastructure and using CloudLink server software applications developed by Huawei to implement setup, routing, and delivery of non-real time (e.g., messages) and real time (e.g., voice and video calls) communication to and from the supported devices using the CloudLink client software applications. The CloudLink server software applications running on servers owned and operated by the Huawei enterprise customer include the Huawei Calling feature incorporating techniques described in the Patents-in-Suit.  The Huawei CloudLink Calling System not only serves these purposes, but, given its particular focus on messaging and voice-over-IP services, is not a staple article or commodity suitable for only non-infringing uses.

39.    Defendants actively encourage and enable users of Huawei desktop computers, laptops, tablets, smartphones, and mobile devices having Huawei hardware, firmware, configuration data, and/or VoWiFi client software applications to use the wireless telephone companies to make VoWiFi calls. Defendants actively encourage and enable users having devices with Huawei hardware, firmware, configuration data, and/or VoWiFi client software applications to use VoWiFi as a voice and/or video calling feature incorporating techniques described in the Patents-in-Suit.

40.    Additionally, Defendants actively encourage and enable the wireless telephone companies to use one or more communication networks, one or more servers, one or more services, and/or one or more other resources associated with VoWiFi server software applications to implement setup, routing, and delivery of non-real time (e.g., messages) and real time (e.g., voice and/or video calls) communication to and from the supported devices using Huawei hardware, firmware, configuration data, and/or VoWiFi client software applications.

15

41.     Defendants actively encourage and enable the wireless telephone companies to use the VoWiFi server software applications running on servers owned and/or operated by the wireless telephone companies to include VoWiFi as enabled for Huawei devices as a voice and/or video calling feature.  Defendants provide instructions for using the VoWiFi function and also instructs its phone users to "Contact your [mobile] carrier to activate the VoWiFi function."  See: https://consumer.huawei.com/us/support/content/en-us00879975/

42.     The Huawei Calling System includes users of Huawei desktop computers, laptops, tablets, smartphones, and mobile devices who are encouraged and enabled to send messages including text, images, video and audio to others using one or more Internet-based calling client software applications (e.g., Messenger, WhatsApp, or Hangouts) developed by one or more Internet-based calling companies (e.g., Facebook, WhatsApp, and Google) for supported Huawei devices to communicate with one or more third-party Internet-based calling server infrastructures.

43.     Defendants actively encourage and enable users of Huawei desktop computers, laptops, tablets, smartphones, and mobile devices having Internet-based calling client application to use the Internet-based calling companies to make Internet-based calls. Defendants actively encourage and enable users having Huawei devices with Internet-based calling client software applications to use voice over IP (VoIP), session initiation protocol (SIP), and/or other real-time communication protocols to operate a voice and/or video calling feature incorporating techniques described in the Patents-in-Suit.

44.     Additionally, Defendants actively encourage and enable the Internet-based calling companies to use one or more communication networks, one or more servers, one or more services, and/or one or more other resources associated with Internet-based calling server software applications to implement setup, routing, and delivery of non-real time (e.g., messages) and real

time (e.g., voice and/or video calls) communication to and from the supported Huawei devices using the Internet-based calling client software applications.

45.     Defendants actively encourage and enable the Internet-based calling companies to use the Internet-based calling server software applications running on servers owned and operated by the Internet-based calling companies to provide Internet-based calling as enabled for Huawei devices as a voice and/or video calling feature.

46.     In the Huawei Calling System, for example, Defendants actively encourage and enable Huawei devices and third-party server infrastructures to produce an access code comprising one or more portions of information identifying one or more Internet Protocol (IP) network addresses associated with one or more calling servers in the third-party server infrastructure and/or call session information obtained from one or more calling servers in the third-party server infrastructure.  Either individually or in combination, the IP network addresses associated with the calling servers and/or the call session information, for example, identify a communications channel on a gateway (e.g., one or more calling servers in the third-party server infrastructure) through which communications between the wireless device and the destination node can be conducted. In the Huawei Calling System, for example, Defendants actively encourage and enable Huawei devices and third-party server infrastructures to enable communications from the wireless device to the destination node to be initiated using the access code as described in the Patents-in-Suit.

47.     The Huawei Calling System, the Huawei Cloud Meeting Calling System, and the Huawei CloudLink Calling System are collectively referred to in this Complaint as the Accused Instrumentality or Accused Instrumentalities.

**COUNT 1**
**INFRINGEMENT OF U.S. PATENT NO. 8,630,234**

48.     Paragraphs 1 through 43 are incorporated by reference as if fully stated in this Count.

49.     The Defendants, either alone or in conjunction with others, have infringed and continue to infringe, both directly and indirectly, one or more claims of the '234 patent, including at least exemplary claims 20 and 30, under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States at least certain methods, apparatuses, products and services used for communication, including, without limitation, the Accused Instrumentalities.

50.     For example, the Defendants infringe exemplary claims 20 and 30 of the '234 patent by making, using, offering to sell, selling, and/or importing into the United States at least the Accused Instrumentalities as detailed in Exhibit 3 to this Complaint.

51.     On information and belief, the Defendants have had knowledge of the '234 patent since at least January 14, 2014, when the '234 patent issued.

52.     The Defendants have had knowledge of the '234 patent and their infringement of the '234 patent based at least on the filing of this Complaint.

53.     Despite their knowledge and notice of the '234 patent as of at least the filing of this Complaint, the Defendants have continued to make, use, sell, offer to sell, and /or import the Accused Instrumentalities in the United States in a manner that infringes the '234 patent.  The Defendants knew or should have known that their actions constituted infringement of the '234 patent.  Upon information and belief, the Defendants have failed to take adequate steps to avoid infringing the '234 patent, despite having been on notice of and lacking permission to practice the '234 patent.   Upon  information  and  belief,  the  Defendants  will  continue  to  reap

significantrevenues and savings based on their infringement of the '234 patent. Accordingly, the Defendants' infringement has been and continues to be willful.

54.     The Defendants have induced infringement, and continue to induce infringement, of one or more claims of the '234 patent under 35 U.S.C. § 271(b). The Defendants actively, knowingly, and intentionally induced, and continue to actively, knowingly and intentionally induce infringement of the '234 patent by: making, using, selling, offering for sale, importing, and/or otherwise making available and/or supplying the Accused Instrumentalities; with the knowledge and specific intent that third parties will use the Accused Instrumentalities supplied by the Defendants in their ordinary and customary way to infringe the '234 patent; and with the knowledge and specific intent to encourage and facilitate third party infringement through the dissemination of the Accused Instrumentalities and/or the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information related to the Accused Instrumentalities.

55.    The Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the '234 patent. For example, the Defendants make, sell, offer for sale, use, import, make available, and/or provide the Accused Instrumentalities, which, when used in their ordinary and customary manner as intended by the Defendants, infringe one or more claims of the '234 patent, including at least exemplary claims 20 and 30. Upon information and belief, the Defendants further provide product manuals and other technical information that cause the Defendants' customers and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use. The Defendants' customers and other third parties have directly infringed the '234 patent, including at least exemplary claims 20 and 30, through the normal and customary use of the Accused

Instrumentalities.   By providing network infrastructure, network services, and device configurations for enabling the Accused Instrumentalities, and instruction and training to customers and other third parties on how to use the Accused Instrumentalities in an infringing manner, the Defendants specifically intended to induce infringement of the '234 patent, including at least exemplary claims 20 and 30.  The Defendants accordingly have induced and continue to induce the Defendants' customers and other users of the Accused Instrumentalities in their ordinary and customary way to infringe the '234 patent, knowing, or at least being willful blind to the fact, that such use constitutes infringement of the '234 patent.

56.   On information and belief, Defendants make, have made, used, sold, offered to sell, and have imported into the United States numerous consumer devices intended for wireless cellular telephone companies that enable Huawei's customers including, but not limited to, Verizon, T-Mobile and AT&T, to offer services and features on their networks that enable users to access Internet-based calling and messaging services, where said Huawei devices include, but are not limited to, the model Nexus 6P phones manufactured by Huawei for Google, described on Wikipedia:   https://en.wikipedia.org/wiki/Nexus_6P (last visited Nov. 10, 2021).   Google's website lists other Huawei models compatible with Google-Fi including: Honor 8, Mate 10 Pro, Mate   20,   Mate   20   Pro   and   20   Lite,   P20   and   P20   Pro.      See: https://support.google.com/fi/answer/6224695#zippy=%2Chuawei-models-compatible-with-fi (last visited Nov. 25, 2021).

57.   On information and belief, Defendants make, have made, use, sell, offer to sell, and import into the United States numerous models of Huawei phones that are unlocked for all carriers and are sold by Amazon.com throughout the United States, including in this District, for example, on                         the                         link                         that                         follows:

https://www.amazon.com/s?k=Huawei+phones&rh=n%3A2335752011%2Cp_89%3AHUAWEI
&dc&qid=1636617687&rnid=2528832011&ref=sr_nr_p_89_1 (last visited Nov. 11, 2021,
showing 167 search results for "Huawei phone" filtered with "unlocked" from various sellers,
including the "Huawei Store").

58.      On information and belief, the Defendants provide explicit instructions on using
the Accused Instrumentality to encourage and enable users to access VoWiFi and/or Internet-
based calling and messaging services, including, but not limited to: "Huawei Nexus 6P review:
Setting it up" at https://www.gsmarena.com/huawei_nexus_6p-review-1355p6.php (last visited
on Nov. 10, 2021); "Use VoWiFi for a New Calling Experience" at
https://consumer.huawei.com/ph/support/content/en-us00457449/ (last visited Nov. 11, 2021);
"Use VoWiFi to Make Calls" at https://consumer.huawei.com/us/support/content/en-
us00879975/ (last visited Nov. 29, 2021).

59.      On information and belief, the Defendants provide explicit instructions on how to
active and make a Wi-Fi call on Huawei phones, including, but not limited to: "Huawei WiFi
Calling (VoWiFi) – Activate, Eligible Devices" https://www.huaweicentral.com/how-to-activate-
wi-fi-calling-vowifi/ (last visited Nov. 11, 2021).

60.      Defendants provide explicit instructions on how to make Facebook Messenger calls
on Huawei phones, including, but not limited to: "[Apps guide] How to download Facebook
Messenger to your HMS phone" at
https://consumer.huawei.com/en/community/details/%5BApps-guide%5DHow-to-download-
Facebook-Messenger-to-your-HMS-phone/topicId_79483/ (last visited Nov. 10, 2021).

61.      Upon information and belief, using the Accused Instrumentalities to implement the
above instructions causes the Accused Instrumentalities to infringe the '234 patent.  Thus, the

Defendants induce users by providing instructions for establishing a call that causes the infringing actions.

62.     The Defendants have contributed and continue to contribute to the infringement by others, including their customers, of the '234 patent under 35 U.S.C. § 271(c) by, among other things, making, selling, offering for sale within the United States and/or importing into the United States or otherwise making available the Accused Instrumentalities for use in practicing the patented inventions of the '234 patent, knowing that the Accused Instrumentalities and components are especially made or adapted for use in infringement of the '234 patent, embody a material part of the inventions claimed in the '234 patent, and are not staple articles of commerce suitable for substantial non-infringing use.  The Defendants' customers directly infringe the '234 patent by using the Accused Instrumentalities.

63.     The Defendants' conduct in infringing the '234 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT 2
## INFRINGEMENT OF U. S. PATENT NO. 10,880,721

64.     Paragraphs 1 through 59 are incorporated by reference as if fully stated in this Count.

65.     The Defendants, either alone or in conjunction with others, have infringed and continue to infringe, both directly and indirectly, one or more claims of the '721 patent, including at least exemplary claim 51, under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States at least certain methods, apparatuses, products and services used for communication, including, without limitation, the Accused Instrumentalities.

66.     For example, the Defendants infringe exemplary claim 51 of the '721 patent by making, using, offering to sell, selling, and/or importing into the United States at least the Accused Instrumentalities as detailed in Exhibit 4 to this Complaint.

67.     The Defendants have had knowledge of the '721 patent and their infringement of the '721 patent based at least on the filing of this Complaint.

68.     Despite their knowledge and notice of the '721 patent as of at least the filing of this Complaint, the Defendants have continued to make, use, sell, offer to sell, and/or import the Accused Instrumentalities in the United States in a manner that infringes the '721 patent.  The Defendants knew or should have known that their actions constituted infringement of the '721 patent.  Upon information and belief, the Defendants have failed to take adequate steps to avoid infringing the '721 patent, despite having been on notice of and lacking permission to practice the '721 patent.  Upon information and belief, the Defendants will continue to reap significant revenues and savings based on their infringement of the '721 patent.  Accordingly, the Defendants' infringement has been and continues to be willful.

69.     The Defendants have induced infringement, and continue to induce infringement, of one or more claims of the '721 patent under 35 U.S.C. § 271(b).  The Defendants actively, knowingly, and intentionally induced, and continue to actively, knowingly and intentionally induce infringement of the '721 patent by: making, using, selling, offering to sell, importing, and/or otherwise making available and/or supplying the Accused Instrumentalities; with the knowledge and specific intent that third parties will use the Accused Instrumentalities supplied by the Defendants in a customary or ordinary way to infringe the '721 patent; and with the knowledge and specific intent to encourage and facilitate third party infringement through the dissemination of the Accused Instrumentalities and/or the creation and dissemination of promotional and

marketing materials, supporting materials, instructions, product manuals, and/or technical information related to the Accused Instrumentalities.

70.     The Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the '721 patent.  For example, the Defendants make, use, sell, offer to sell, use, import, and/or make available and provide the Accused Instrumentalities, which, when used in their ordinary and customary manner as intended by the Defendants, infringe one or more claims of the '721 patent, including at least exemplary claim 51.  Upon information and belief, the Defendants further provide product manuals and other technical information that cause the Defendants' customers and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use.  The Defendants' customers and other third parties have directly infringed the '721 patent, including at least exemplary claim 51, through the ordinary and customary use of the Accused Instrumentalities. By providing network infrastructure, network services and device configurations for enabling the Accused Instrumentalities, and instruction and training to customers and other third parties on how to use the Accused Instrumentalities in an infringing manner, the Defendants specifically intended to induce infringement of the '721 patent, including at least exemplary claim 51.  The Defendants accordingly have induced and continue to induce the Defendants' customers and other users of the Accused Instrumentalities in their ordinary and customary way to infringe the '721 patent, knowing, or at least being willful blind to the fact, that such use constitutes infringement of the '721 patent.

71.     On information and belief, Defendants make, have made, used, sold, offered to sell, and have imported into the United States numerous consumer devices intended for wireless cellular telephone companies that enable Huawei's customers including, but not limited to, Verizon, T-

Mobile and AT&T, to offer services and features on their networks that enable users to access Internet-based calling and messaging services, where said Huawei devices include, but are not limited to the model Nexus 6P manufactured by Huawei for Google, described at: https://en.wikipedia.org/wiki/Nexus_6P (last visited Nov. 10, 2021). Google's website lists other Huawei models compatible with Google-Fi including: Honor 8, Mate 10 Pro, Mate 20, Mate 20 Pro and 20 Lite, P20 and P20 Pro. See: https://support.google.com/fi/answer/6224695#zippy=%2Chuawei-models-compatible-with-fi (last visited Nov. 25, 2021).

72.     On information and belief, Defendants make, have made, use, sell, offer to sell, and import into the United States numerous models of Huawei phones that are unlocked for all carriers and are sold by Amazon.com throughout the United States, including in this District, on at least the                    link                    that                    follows: https://www.amazon.com/s?k=Huawei+phones&rh=n%3A2335752011%2Cp_89%3AHUAWEI &dc&qid=1636617687&rnid=2528832011&ref=sr_nr_p_89_1 (last visited Nov. 11, 2021, showing 167 search results for "Huawei phone" filtered with "unlocked" from various sellers, including the "Huawei Store").

73.     On information and belief, the Defendants provide explicit instructions on using the Accused Instrumentality to encourage and enable users to access Internet-based calling and messaging services, including, but not limited to:  "Huawei Nexus 6P review: Setting it up" described at: https://www.gsmarena.com/huawei_nexus_6p-review-1355p6.php (last visited on Nov. 10, 2021).

74.     On information and belief, the Defendants provide explicit instructions on how to make a Wi-Fi call on Huawei phones, including, but not limited to:  "Huawei WiFi Calling (VoWiFi) – Activate, Eligible Devices" https://www.huaweicentral.com/how-to-activate-wi-fi-calling-vowifi/ (last visited Nov. 11, 2021); "Use VoWiFi to Make Calls" at https://consumer.huawei.com/us/support/content/en-us00879975/ (last visited Nov. 29, 2021).

75.     Defendants provide explicit instructions on how to make Facebook Messenger calls on Huawei phones, including, but not limited to:  "[Apps guide] How to download Facebook Messenger          to          your          HMS          phone"                    at https://consumer.huawei.com/en/community/details/%5BApps-guide%5DHow-to-download-Facebook-Messenger-to-your-HMS-phone/topicId_79483/ (last visited Nov. 10, 2021).

76.     Upon information and belief, using the Accused Instrumentalities to implement the above instructions causes the Accused Instrumentalities to infringe the '721 patent.  Thus, the Defendants induce users by providing instructions for establishing a call that causes the infringing actions.

77.     The Defendants have contributed and continue to contribute to the infringement by others, including their customers, of the '721 patent under 35 U.S.C. § 271(c) by, among other things, making, selling, offering for sale within the United States and/or importing into the United States the Accused Instrumentalities for use in practicing the patented inventions of the '721 patent, knowing that the Accused Instrumentalities and components are especially made or adapted for use in infringement of the '721 patent, embody a material part of the inventions claimed in the '721 patent, and are not staple articles of commerce suitable for only non-infringing use.  The Defendants' customers directly infringe the '721 patent by using the Accused Instrumentalities.

78.     VoIP-Pal has been and continues to be damaged by the Defendants' infringement of the '721 patent.

79.     The Defendants' conduct in infringing the '721 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38(a), VoIP-Pal demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, VoIP-Pal prays for the following relief:

a)      A judgment and order that the Defendants have directly infringed (either literally or under the doctrine of equivalents) and/or induced and/or contributed the infringement under 35 U.S.C. § 271 of the Patents-in-Suit;

b)      A judgment and order permanently enjoining the Defendants, their respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns and any other person(s) in active concert or participation with the Defendants from infringing the Patents-in-Suit for the full term of the Patents-in-Suit;

c)      A judgment that the infringement of the Patents-in-Suit by the Defendants has been willful;

d)      A judgment and order requiring the Defendants to pay VoIP-Pal an award of damages under 35 U.S.C. § 284, adequate to compensate VoIP-Pal for the Defendants' past infringement, but in no event less than a reasonable royalty, including enhanced damages as provided by 35 U.S.C. § 284, and supplemental damages for any continuing post-verdict infringement up until entry of the final judgment with an accounting, as needed, as well as damages

for any continuing or future infringement up to and including the date that the Defendants are finally and permanently enjoined from further infringement;

e)      A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that VoIP-Pal be awarded a compulsory ongoing licensing fee;

f)      A judgment and order that this action be found an exceptional case pursuant to 35 U.S.C. § 285, entitling VoIP-Pal to an award of all costs of this action, including attorneys' fees and interest;

g)      A judgment and order requiring the Defendants to pay VoIP-Pal the costs of this action;

h)      A judgment and order requiring the Defendants to pay VoIP-Pal pre-judgment and post-judgment interest on the damages award; and

i)      Such other and further relief as the Court deems just and equitable.


Dated: November 30, 2021

Respectfully submitted,


By: /s/Lewis E. Hudnell, III
Lewis E. Hudnell, III
lewis@hudnelllaw.com
Nicolas S. Gikkas
nick@hudnelllaw.com
Hudnell Law Group P.C.
800 W. El Camino Real Suite 180
Mountain View, California 94040
T: 650.564.3698
F: 347.772.3034

**ATTORNEYS FOR PLAINTIFF**
**VOIP-PAL.COM, INC.**

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT via the Court's CM/ECF system under the Federal Rules of Civil Procedure and Local Rule CV-5(b)(1) this 30th day of November, 2021.

By: */s/Lewis E. Hudnell, III*
    Lewis E. Hudnell, III
    lewis@hudnelllaw.com
    Hudnell Law Group P.C.
    800 W. El Camino Real Suite 180
    Mountain View, California 94040
    T: 650.564.3698
    F: 347.772.3034